# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

June 2, 2004 Session

## STATE OF TENNESSEE v. CHRISTOPHER HATCHER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-09093   W. Otis Higgs, Jr., Judge**

---

**No. W2003-01867-CCA-R3-CD  - Filed September 15, 2004**

---

The Defendant, Christopher Hatcher, was tried and convicted for first degree felony murder, second degree murder, attempted first degree murder and reckless endangerment for shooting three victims. The trial court merged the second degree murder conviction with the felony murder conviction and then sentenced the Defendant to life with the possibility of parole for the felony murder conviction, twenty years for the attempted murder conviction, and eleven months and twenty-nine days for the reckless endangerment conviction. The Defendant appeals, contending that: (1) the trial court erred by not granting his motion for new trial because the State failed to give the Defendant exculpatory evidence; (2) the trial court improperly allowed the State to refer to an alleged robbery previously committed by the Defendant; (3) the trial court erred when it allowed a witness to testify about the alleged robbery; (4) the trial court improperly allowed expert fingerprint testimony; (5) the trial court erred when it did not grant a mistrial based upon the State's biblical references; (6) the trial court erred by refusing to dismiss a sleeping juror; (7) the trial court erred when it allowed hearsay testimony of a witness; and (8) the evidence is insufficient to sustain his conviction. After a thorough review of the record and applicable case law, we conclude that there is no reversible error in the judgments of the trial court. Accordingly, we affirm its judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Juni Ganguli and James Thomas, Memphis, Tennessee, for the appellant, Christopher Hatcher.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Tom Hoover and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

1

**OPINION**
**I. Facts**

This case arises from the murder of Marcel Mackey and the shooting of Randall White and Anitra Flowers on April 2, 2001.[1] The Defendant was indicted on one count of first degree premeditated murder, one count of first degree felony murder and two counts of attempted first degree murder. During the Defendant's trial, the following evidence was presented.

Byron Braxton, a police officer with the Memphis Police Department, testified that at 9:07 p.m. on April 3, 2001, he was called to the Raintree Apartments because a "citizen called in [and] reported they were hearing gunshots being fired inside the complex." The officer said that, when he heard the radio report that someone had been shot, he responded to the call. The officer said that, when he arrived at the apartment, he saw a woman in an Auto Zone uniform and a man who had been shot several times and was "bleeding profusely." The officer said that, after two other officers arrived, he checked the apartment thoroughly and found four or five other people in the back of the apartment. In the bathroom, he found a man and a woman, both of whom had several wounds to their legs, and he found three children in a bedroom "huddled together and crying." On cross-examination, the officer testified that he did not recall the exact time of the shooting, but that it was dark when he got the call. He also stated that there was only one outside light near the downstairs apartment.

Randall ("Red") White testified that, on April 2, 2001, he was living in Raintree Apartments with his girlfriend Anitra Flowers and her three children: Kevin, Knee-Knee (phonetic), and Christina. He said that his building contained approximately eight apartments, four upstairs and four downstairs, and he lived in a downstairs apartment that had a door that opened to a parking lot. White testified that, on the day of the shooting, he took Kevin Flowers to his cousin's house, and then two of his friends, Marcellus Macklin and Athena ("Dana") Cartwright, came over. He said that, at the time of the shooting, Macklin, Cartwright, Anitra Flowers, Knee-Knee, Christina, and himself were present at the apartment. White testified that, immediately prior to the shooting, he and Anitra Flowers were eating fish in the living room and he was drinking a beer, but had only had a couple of sips. He said that he heard a knock at the door and, upon looking out, saw a man that he did not recognize, but thought that he might have seen the man in the apartment complex. White testified that he asked his friend, Macklin, whether he knew the man at the door, and Macklin said that he did not. White said that Macklin, who was getting up anyway, went to the door first, and he "got up right behind him to see who it was at the door."

White testified that he was going to look out the door before opening it, but that Macklin opened the door first. He said that he saw the Defendant coming from the side of the apartment building, and, as soon as Macklin opened the door, the Defendant started shooting toward the

---

[1] There is conflicting testimony about whether the crime occurred on April 2, 2001, or April 3, 2001, but on appeal the parties agree that the shooting occurred on April 2, 2001.

2

door with "some kind of . . . rifle." White said that he saw three men outside the door, but once the shooting started he ran into the living room.

Over the Defendant's objection, White testified that he recognized the Defendant because the Defendant and the Defendant's brother had previously asked to purchase some marijuana from him. White said that he told them that he had some marijuana to sell to them, and the two men "pulled a gun" on him and took the marijuana that he had with him at the time, some money, jewelry, and a pager. White said that, at the time of the robbery, there was another man with him who recognized the Defendant and the Defendant's brother.

White said that the Defendant shot and killed Macklin and also shot both White and Anitra Flowers. White said that, after he ran into the living room, he looked back and saw the Defendant take "one step in[to] the kitchen." He testified that he saw the Defendant first outside the apartment and then again inside the apartment. White said that the two other men who were with the Defendant did not come into the apartment. He said that he was shot in the back, the leg and the buttocks and that he was shot with three different guns, an assault rifle, a .380 caliber handgun, and a .22 caliber handgun. White said that, after the shooting, he went into the children's bedroom to call the police, and he saw that Anitra Flowers was under one bed and the kids under another bed.

White testified that the police showed him multiple photographs on April 10, 2001, and, from those, he was able to identify the Defendant. White stated that, on April 10, 2001, he was still in the hospital and was taking Percocet for pain, but was still able to positively identify the Defendant.

On cross-examination, White testified that, before the shooting, he had been selling drugs out of his apartment for approximately two months. He said that he sold "little dime bags of weed," and he smoked marijuana himself occasionally. White said that, since the shooting, he had moved to Chicago. White testified that he smoked marijuana the morning of the murder and he had a few sips of wine. White admitted that he had previously been convicted of felony theft. He said that, at the time of the murder, it was dark outside, and the Defendant wore a hood, so he could not see the Defendant's hair or his ears. White testified that the whole event occurred quickly and that the shots were fired almost immediately after Macklin opened the door.

Ashanti Pinkins testified that, on the evening of April 3, 2001, she was walking with two friends, Timothy Jackson and Tiffany Brown, when two men, "Chris and Shawn," stopped them. At first, Pinkins could not identify the man that she called "Chris" in the courtroom. She said that she knew Chris and Shawn because she knew their sister, but she had not seen either of the men in about two years. Pinkins testified that, when Chris and Shawn stopped her and her friends, they asked whether she and her friends had seen "Red." Pinkins said that Chris and Shawn were with two or three other people, but she could not identify them because they had ski masks on. She said that everyone in the group was wearing black or blue and it was dark outside. Pinkins explained that, after the men asked if they had seen "Red," Jackson said, "no, Chris, we haven't seen Red," and Chris responded, "how you know my name?" Pinkins recalled that Jackson responded, "I used to go to school with your little sister," and Chris became angry

3

and put "the gun up to Timothy's side," causing Jackson to run away. Pinkins described the gun as a "long black gun with a banana clip." She said that, after Jackson left, Chris was still standing there while Shawn and the other men went running through a field, and Shawn was telling Chris "come on, come on . . . . They okay. They okay, man, they straight. We know them," so Chris ran through the field as well. Pinkins testified that the men ran in the direction of "Red's" house.

Pinkins testified that, thereafter, she ran around a nearby building and into her house. She said that she locked her door and then heard "a whole lot" of gunshots and then a police car. Pinkins testified that the day after the incident she was shown a photo array that included the Defendant, and she identified the Defendant's picture as the man who she called Chris. With her memory refreshed, she then identified the Defendant as Chris, and she said that he had changed his appearance in the two years since she had seen him. Pinkins also testified that she identified Shawn Hatcher, the Defendant's brother, in a photo array.

On cross-examination, Pinkins testified that on the photo array sheet she wrote, "this is the man I saw at Red's door shooting," which was not a true statement. She said that she "didn't mean to write that . . . because she didn't see [any]body shoot." Pinkins testified that she did not want to give a statement to police because she was scared, but the police, who had picked her up and brought her to the police station, refused to take her home until she gave a statement. She explained that she told the police that she had not seen the Defendant shooting, but they were "constantly asking me was I sure" and would not take her home, so she wrote the statement on the photo array because she wanted to go home.

Timothy Jackson testified that, at around 9:00 p.m. on April 3, 2001, he was with two friends, Pinkins and Brown, when "Chris and his brother" stopped them and asked them, "where's Red at?" Jackson responded that he did not know Red. Jackson said that Chris then asked him how he knew Chris's name, and Jackson said, "I went to school [with your sister]." Jackson testified that Chris then "put the gun to my side," so Jackson ran away and hid behind a car. Jackson said that, after he ran away, Chris and his brother went the other way. Jackson testified that he could not recognize Chris on the day of trial, but was able to identify his picture after the incident took place. Jackson said that he knew who Chris and his brother were because he had seen them before around the apartment complex. Jackson described the gun that Chris used as "a long gun" and said that Chris and his brother did not have anything covering their faces. He said that there were approximately four other men with Chris and his brother, all of whom were armed and wearing masks. Jackson testified that he was shown a photo array by the police and that he identified the Defendant's picture as that of Chris. He said that he also identified Shawn Hatcher, the Defendant's brother, as the man who was with Chris on the night of the incident.

On cross-examination, Jackson testified that the Defendant was with five people on the night of the shooting and that they all had guns. Jackson said that the Defendant never shot at him and allowed him to leave. He also reiterated that he never saw who did the shooting at the victim's house. Jackson said that he gave his statement to police while he was in a correctional facility.

4

George Norman testified that he lived at Raintree Apartments and was the groundsman there. He said that, on April 3, 2001, he was closing an apartment and saw approximately five men walking, one of whom he recognized as the Defendant. Norman testified that he saw the Defendant walking towards the victim's home with three or four other men and that one or two of the men were masked. Norman testified that one of the men stopped to talk to a girl, and, after he and the girl talked for a while, the man took out a gun and the girl ran away. He testified that he later heard a lot of shooting, so he called 9-1-1. He said the shooting sounded like "war," and he heard machine guns, a shotgun and a pistol. Norman testified that he gave a statement to police the day after the incident.

On cross-examination, Norman testified that, when he called 9-1-1, he was in his apartment and did not mention the Defendant to the 9-1-1 operator. He said that he knew the Defendant because he had seen him in the apartment complex before. Norman stated that he did not see the Defendant shoot anyone. Norman testified that he could not read, so he did not know what was written in the statement that he gave to police, but police read it to him to make sure that it was accurate. On re-direct examination, the State read Norman's statement to police on April 4, 2001, into the record, and Norman verified that the statement was accurate. Then, Defense counsel asked Norman whether the words used in the statement were Norman's, and Norman responded that he provided the Defendant's description. Defense counsel then asked Norman to describe the Defendant in his own words, and Norman responded, "I can't. I don't know." The following occurred:

Q. [Defense Counsel]      Okay. Are you able to see me?
A. [Norman]      Yeah.
Q.[Defense Counsel]      Okay. You're not able to describe me at all?
A.[Norman]      Far. Far.
Q.[Defense Counsel]      Sir.
A.[Norman]      Some.
Q.[Defense Counsel]      Some?
A.[Norman]      (No audible response.)
Q.[Defense Counsel]      Your description of me is the word some?
A.[Norman]      (No audible reponse.)

Athena Cartwright testified that she was Marcel Mackey's girlfriend at the time of his murder. She said that she had been dating him for approximately seven years. She said that, on April 3, 2001, she went to Randall Moore and Anitra Flowers' apartment after she got off work. She said that Flowers cooked some fish and, thereafter, they heard "some knocks on the door." Cartwright testified that she was in the hallway when the door was opened, and Flowers was on the couch. When Mackey opened the door, all she heard were gunshots. She said that the gunshots lasted for approximately five or ten minutes and that, when they stopped, she went to the kitchen and found Mackey lying under the kitchen table face down. She said that she checked to see if Mackey was breathing and he was not. On cross-examination, Cartwright testified that she could not see who had done the shooting.

5

Anitra Flowers testified that she had three children, and, on April 3, 2001, she was living at 756 East Rains Apartment Number 1 with her children, Christina, Chanita and Kevin, and with Randall Moore. She said that, during the evening of April 3, 2001, she fried fish for dinner and, after eating, she was sitting in her "front room, listening to the radio and watching TV," when she heard a knock a the door. She said that she leaned forward to see who it was. She said that she did not know the person knocking, and told Moore and Mackey that someone was at the door. She said that Mackey got up first and Moore went behind him to the door. She said that, as soon as the door opened, she "felt like I was in Beirut. Gunshots were coming from two different directions. I was stuck in the middle in this room. I had my children in the house and I was trying to get them not to come out of their room." She said that she "hit the floor" and that was when she realized that she had been shot. Flowers testified that she crawled to where her children were and told them to get under the bed and to stay there. Flowers said that she heard Cartwright screaming that Mackey was dead, and she called 9-1-1. Flowers said that she could only see that the man at the door was "a dark skinned guy and he had on black." On cross-examination, Flowers testified that she did not recall how long this incident lasted and that she did not see who was firing the gun.

Christina Flowers testified that she was Anitra Flowers' daughter, and she was living at the Raintree Apartments on April 3, 2001. She said that, during the evening of April 3, 2001, she was on the phone when she heard a gunshot. She stated that, after she went in the hallway, "[I] looked in the living room I saw someone shooting at my mother and she fell over the couch and I dropped the phone and started crying." Flowers testified that she then went back into the bedroom with her little sister. Flowers said that she saw "Chris" outside her bedroom window walking towards her back door, and she said that he was one of the men shooting a gun at the apartment, but she "heard more than one gun." At trial, Flowers was unable to identify the Defendant as the man she called "Chris," but she did identify him in a photo array, stating, "This looks like Chris and there was a lot of shooting and I saw him shooting the gun." Flowers testified that the first time she saw the Defendant was before April 3, 2001, when he robbed Randall Moore outside of her apartment.

On cross-examination, Christina Flowers testified that she did not see the face of any of the men the night of the shooting. She said that she did not see "Chris" outside of her window because it was dark outside. Flowers said that she did not see "Chris" shoot a gun and that it was not the truth when she told police that she had.

Latoya Brown testified that she was living in Raintree Apartments on April 3, 2001, and was watching television that evening with her cousin and two sisters when she heard gunshots. She said that she went outside and saw four "boys" running and told them to stop shooting. She said that one of the "boys" fired back at her twice. She said that the gun that was fired at her appeared to be a "long gun." Latoya Brown testified that she was unable to identify anyone as the man who shot at her that evening.

Rickey Davison, an officer with the Memphis Police Department, testified that he served as a crime response technician. He said that he was called to the murder scene at Raintree Apartments on April 3, 2001, to investigate the scene. He said that he found a casing for a bullet

6

that was shot out of a gun similar to an AK-47 assault rifle and a projectile from a .22 caliber gun inside the apartment and three shotgun shells outside the apartment. The officer testified that the victim was face down when he arrived, and that, when the victim was turned over, there appeared to be multiple gunshot wounds to his abdomen area.

Kevin Shaver, an officer with the Memphis Police Department, testified that he was called to the murder scene at Raintree Apartments on April 3, 2001, as part of the Crime Response Unit. He said that he made sketches of the crime scene. Shaver also testified that he collected most of the evidence at the scene. On cross-examination, Officer Shaver admitted that none of the evidence he collected directly implicated the Defendant.

Gerald Paige, an officer with the Memphis Police Department, testified that he investigated the crime scene at Raintree Apartments on April 3, 2001. He said that he drew a sketch of the outside of the apartment and itemized each piece of key evidence. On cross-examination, Officer Paige admitted that none of the evidence he collected directly implicated the Defendant in this crime.

Rachael Bowen, a fingerprint technician with the Memphis Police Department, testified as an expert that she is qualified to examine fingerprints to determine whether they match. She testified that the fingerprints of the man pictured in the photo array, which was shown to witnesses shortly after the murder, matched the Defendant's fingerprints. On cross-examination, Bowen testified that there was no fingerprint evidence linking the Defendant to the scene of the crime.

Cornelius Jefferson testified that he knew the Defendant and met him during the evening of April 3, 2001. He said that he was in the Defendant's backyard visiting the Defendant's brother when the Defendant "came up talking about [how] . . . he had some problems on the other end of the neighborhood." Jefferson explained that the Defendant said that there were threats being made against "the house" and that he was going to stop the threats. Jefferson said that he realized that it was time for him to leave, and the Defendant stopped him with a rifle. He testified that he left the Defendant's house with the Defendant, who had a rifle, the Defendant's brother, and another man, who he did not know but who was armed with a shotgun. Jefferson said that he did not know where they were going, but he knew that guns were going to be involved. He said that, when they left, he was unarmed and the four men walked towards Raintree Apartments to "Red's" apartment. Jefferson said:

> [W]hen we first got there we [were] all pretty much lined up side-by-side. And [the Defendant] sent me and his partner . . . ahead of him. And they ran into some kids. . . . [I]t seemed as if . . . he was about to raise his gun up . . . and he started to [raise it at the kids]. . . . [A]fter we proceeded to move from the kids . . . [the Defendant] made us walk over towards the house. . . . [H]e proceeded to make me knock on the door.

Jefferson testified that, after he knocked on the door, the Defendant pushed Jefferson out of the way and Jefferson ran away to the gas station. He said that he called one of his cousins to

7

come and get him. Jefferson testified that, as he was running, he heard "a lot of shots" being fired. On cross-examination, Jefferson admitted that he was charged with first degree murder as a result of these events and that his attorney arranged, and the State agreed, that he would receive an eight-year sentence for his conviction for first degree murder if he testified against the Defendant. He also conceded that he was told that he could receive probation. Jefferson said that, on the day of the shooting, he smoked marijuana and drank liquor with the Defendant's brother. Jefferson said that he did not go to the police to turn himself in until a week after the incident and came with a lawyer who represented him. On redirect examination, Jefferson said that he had no deals with the State about whether he would receive probation. Jefferson testified that he did not contact police after the shooting because he was scared of the Defendant.

Nathan Berryman, an officer with the Memphis Police Department, testified that he works on the homicide squad. He said that he assisted in the investigation of Marcel Mackey's murder in April of 2001. Officer Berryman testified that he interviewed Pinkins, and he showed her a photo array from which she identified the Defendant as the man she saw shooting at "Red's" door. The officer said that he also interviewed the Defendant as part of his investigation. He said that he read the Defendant his Miranda rights, and the Defendant signed a waiver of those rights. The officer read his notes from the interview into evidence, stating:

> [A]t 4:50 p.m., writer along with Sergeant V. Owens began an interview with [the Defendant], twenty-one years old, date of birth 1/18/80. [The Defendant] was advised of Rights Form agreeing to talk to us.
>
> [The Defendant] advised that at six a.m. he had gotten up early and went with his mother to look for a car. He said that they went to Reuben's house to MLG&W, and juvenile court to pick up his brother Shawn. He said that they left juvenile court at around 1:30 p.m. and went to two more car lots.
>
> At 3:30 p.m. to 3:45 p.m. he said that his mother and Geraldine dropped him and his brother Shawn off at home, which is 769 Rosebank, and mama and Geraldine went shopping. [The Defendant] said that Shawn cooked him something to eat while he cleaned up the house and watched TV. He said that he watched either Power of Attorney or Texas Justice while he cleaned the house.
>
> Mama and Gerealdine came back home at about 5:30 p.m. with groceries and a lawn mower. [The Defendant] said that he and Shawn helped unload the groceries and lawn mower.
>
> Before 6:30 p.m. [The Defendant] thought Shawn had called Cornelius. And around 6:30 p.m. Cornelius came to his house . . . with his cousins, Terrence and T.J., and another dude that he did not know. Cornelius drove up in a large red four-door Chrysler with nice rims. They all hung around for about an hour and thirty minutes smoking weed. At about 7:30 p.m. to 7:45 p.m. they left and Shawn went with them.

8

After Shawn, Cornelius and the others had left, [The Defendant] said that around 8:00 p.m. he walked to the Snappy Sacker and bought a beer. He then walked to the Raintree Apartments and sat on the steps in front of Aja's building smoking weed and drinking his beer. While he was sitting on the steps he saw a grey car constantly riding around the Raintree Apartments, playing their music loud and driving around the apartment complex. He said that the grey car had about six guys in the car. [The Defendant] said that the grey car drove around to the back of the apartment complex and parked on the dark side of the parking lot. He said he saw about four to five guys get out of the car with guns, one of the . . . guns was a shotgun. And at least one had a ski mask on.

[The Defendant] said that when he saw them he started walking toward them to see where they were going. While he was walking toward them they approached a boy who was with two girls. They asked the boy if he knew Red, then when the boy said that he didn't know who Red was, the dude pulled a shotgun on him and the boy ran. [The Defendant] said that because he was standing nearby that people might think that he was with the masked men, however, he denied being involved with any of them.

The men with the guns then went to Red's apartment and he followed them to see what was going on. He then heard several gunshots. After he heard the gunshots he went to the Audubon Park Apartments and just sat around outside. Not long after he got to the Audubon Park his stepmother, Geraldine, called him on his cell phone and he said that somebody had just been killed at the Raintree. His stepmother was crying and she told him to turn himself in even if he didn't do it because the police were looking to shoot to kill.

He got a ride from a female cab driver who was driving her personal car, the female [was] named Robbie. Robbie drove him to a hotel in West Memphis, Arkansas, but he didn't know the name of the hotel at 11:00 a.m. on April 4, 2001. At about 12:00 p.m. his mother and stepmother and girlfriend, Tina, came to pick him up and brought him to the homicide office.

[The Defendant] was asked if he had problems with Red, and he said that it was nothing. [The Defendant] said that about a month ago his cousin Derrick and some other dude had robbed Red, and Red thought that it was him and Shawn. [The Defendant] said that Red had made some threats but he wasn't afraid of him and he didn't have any reason to shoot him.

. . . .

The writer and Sergeant Owens pointed out many inconsistencies in [The Defendant's] story. And [the Defendant] said look, I was trying to cover my brother's ass. He did that shit. In this version of the story he said that Shawn called Cornelius when they picked him up from juvenile court and asked

9

Cornelius to bring some guns over.  When Cornelius arrived at the house he was in a red car . . . and then he left and came back in a grey car.

[The Defendant] said that Shawn was mad about Red for threatening his mother, but [the Defendant] didn't want to do anything about it, so he didn't go with them.  He only went to watch it go down and saw them go into Red's apartment.  When the writer and Sergeant Owens told him that he had been identified by witnesses as being in possession of an SKA assault rifle, he said that he had lied because he was afraid.  [The Defendant] said that he knew that his life was over because of what he had done.  he said that Red had started it.  He said that Red was pissed off at him for selling weed in the complex. [The Defendant] said that Red was wearing a ski mask and had robbed him sometime in February.  [The Defendant] said that . . . even though the robber was wearing a ski mask, he knew it was Red.  And that he and Shawn went back and started making threats toward him.

[The Defendant] asked the writer if the shooting . . . would be considered self-defense because Red made threats to his family. [The Defendant] also wanted to know if Shawn would get the death penalty for being involved in the shooting.

When the writer asked [the Defendant] if he was sorry for killing somebody, he replied, I ain't sorry, he shouldn't had been going to my mama's house with his hands in his pocket like he had a gun. [The Defendant] got mad and said he shouldn't have brought that shit to his mother's house.

Writer asked [the Defendant] about the whereabouts of the assault rifle or any of the other weapons used in the . . . shooting . . . [and the Defendant] said that Cornelius brought the guns with him when he came over to his house and that the SK assault rifle probably had been passed around several times since the shooting.  [The Defendant] also said that the rifle was at a house with a lot more guns and that the people in the house would not give up the rifles without a fight.  [The Defendant] added that the SK assault rifle that he used was a fully automatic machine gun and that carries federal charges and he didn't want to catch a federal charge.  [The Defendant] said that if he told the writer where the assault rifle was it would put his family in grave danger.

The writer asked [the Defendant] if he was a member of a gang and he replied, Red is a G.D. but I'm not in a gang.  I hang around the Vice Lords, though.  I guess that makes this gang related . . . .  [The Defendant] asked . . . how can I be charged with this if you all don't have the murder weapon nor any fingerprints from the gun?  [The Defendant] agreed to give a typed statement to the writer and Sergeant Owens.

The officer testified that, after this interview, the Defendant refused to give a statement. On cross-examination, the officer testified that, after he reduced his hand written notes to a typed

10

version, he threw away his hand written notes. He said that his interview with the Defendant was not tape recorded or video taped.

Teresa Campbell, M.D., testified that she performed the autopsy of the victim, Marcel Mackey. Dr. Campbell said that the victim had multiple gunshot wounds to the front and back of his body. According to Dr. Cambell, there was a "graze" wound to the victim's abdomen, which split open the skin, muscle and deep connective tissue over the abdomen, but did not penetrate the abdomen. There was a gunshot wound that entered the lower quads of the abdomen, traveled through the victim and exited his back. There was a third gunshot wound to the right arm and a fourth to the left arm. There was a fifth gunshot wound at the lower neck, which fractured the victim's spine before exiting his back. There was a sixth gunshot wound to the face and a seventh to the right shoulder. There was an eighth gunshot wound to the lower back, a ninth to the lower back, a tenth to where the victim's buttocks met his leg, an eleventh to the top of the left back of the leg, and a twelfth to the right upper leg. On cross-examination, the doctor testified that she could not testify about who did the shooting that caused the victim's injuries.

Based upon this evidence, arguments of the parties, and the trial court's instruction of the law, the jury found the Defendant guilty of first degree felony murder, second degree murder, attempted first degree murder, and reckless endangerment. The trial court merged the second degree murder conviction with the conviction for first degree felony murder, and the Defendant was sentenced to life with the possibility of parole for that offense. After a sentencing hearing, the trial court sentenced the Defendant to twenty years for the attempted first degree murder conviction and to eleven months and twenty-nine days for the reckless endangerment conviction, and ordered that those sentences run concurrently with the Defendant's sentence for the first degree felony murder conviction.

## II. Analysis

The Defendant appeals, contending that: (1) the trial court erred by not granting his motion for new trial because the State failed to disclose exculpatory evidence to the Defendant; (2) the trial court improperly allowed the State to refer to an alleged robbery previously committed by the Defendant; (3) the trial court erred when it allowed a witness to testify about the alleged robbery; (4) the trial court improperly allowed expert fingerprint testimony; (5) the trial court erred when it did not grant a mistrial based upon the State's biblical references; (6) the trial court erred by refusing to dismiss a sleeping juror; (7) the trial court erred when it allowed hearsay testimony of a witness; and (8) the evidence is insufficient to sustain his convictions.

### A. Exculpatory Evidence

The Defendant contends that the trial court erred when it failed to grant his motion for a new trial based upon the State's failure to disclose exculpatory evidence to him. He asserts that the State's failure to disclose a statement made by Chanita Flowers, Christina Flowers younger sister, to police violated his constitutional right to exculpatory evidence as stated in Brady v. Maryland, 373 U.S. 83, 87 (1963).

The record establishes that the prosecutor sent a letter to the Defendant's counsel on June 9, 2003, two days after the Defendant's conviction on June 7, 2003, which stated:

> In debriefing after the trial, I ran across the statement of one of the children at the scene of the shooting, Chanita LaShay Flowers. I cannot tell if you were furnished with a copy of the statement, so I am forwarding it to you for your information.
>
> If you are interested, I plan to interview this child and her mother probably on Wednesday of this week. You are welcome to be there and ask what questions you wish.

The statement at issue is a statement made by Chanita Flowers, who did not testify at the Defendant's trial, to police investigators shortly after the murder. The statement that she gave to police was as follows:

> Age: 9
> DOB: 08-08-91 . . .
> Education: 4th Grade
>
>        . . . .
>
> Q: Can you tell me in your own word what happened April 3, 2001, approximately 9:00 p.m.
> A: Last night it was a knock at the door, and Red's friend opened the door then they shot Red's friend. After that they shot Red and they shot my mother.
>
> Q: Who was at your home when this occurred?
> A: me and my sister and Red and Red's friend and my mother's friend.
>
> Q: Did you see who did the shooting o[r] just heard it?
> A: I saw it.
>
> Q: Where were you when they were shooting?
> A: It was two men at the door, they had on black mask.
>
> Q: How many men did you see?
> A: I just saw two.
>
> Q: Did you know either one of the men?
> A: No.
>
> Q: What did you do while they were shooting?
> A: I ran back in my room, and my mother told me to get down under the bed and stay until they stop shooting.

12

Q: What happened next?
A: My mother was on the living room couch and she got shot and ran into my room.

Thereafter, Chanita Flowers identified the photograph of a man other than the Defendant as being involved with this crime. She said:

Q: How do you know the person pictured?
A: Because he always use to be with Squirt.

Q: And the person you picked in the photo lineup was at your house tonight?
A: Yes

Q: What was he doing at your house tonight?
A: He was shooting.

At the hearing on the Defendant's Motion for New Trial, Anitra Flowers testified that she is Chanita Flowers' mother and that Chanita was nine at the time of the shooting. She said Chanita has learning disabilities and is in a resource class at school. Anitra Flowers said that Chanita was in her bedroom when she heard the knock at the door the night of the murder.

Chanita Flowers also testified at the hearing. She said that, on the night of the murder, her mother was laying on the couch and she heard a knock at the door. She said that she heard gunshots, and her mother got shot in the leg. Chanita said that she ran into her room and got on the bed. Chanita testified that she did not know who was at the door and did not see anyone at the door. She said that she saw one man with a mask, but she could not identify anyone who shot at her house. Chanita testified that she identified the man in the photo lineup because he was friends with her uncle, who she calls Squirt. She said that she did not see the man she identified the night of the shooting, and she only saw a man who was wearing a mask. On cross-examination, Chanita admitted that her memory of these events was better closer to the time that they occurred. She said that she did not tell the policemen the truth the night of the shooting because the only men she saw had on masks.

Every criminal defendant is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution. Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This fundamental principle of law is derived from the landmark United States Supreme Court case, Brady v. Maryland, 373 U.S. 83 (1963), in which the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Our Supreme Court has said, "Evidence 'favorable to an accused'

includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson, 38 S.W.3d at 55-56 (citing State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998)).

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain," but its duty to disclose "is not limited in scope to 'competent evidence' or 'admissible evidence.'" State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992) (quoting United States v. Gleason, 265 F. Supp. 880, 886 (S.D.N.Y. 1967)). A prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf of the case, including police." Johnson, 38 S.W.3d at 56 (quoting Strickler v. Green, 527 U.S. 263, 275 (1999)). While the State has this obligation, there is no requirement that it make a complete and detailed accounting to the defense of all police investigatory work on a case. Walker, 910 S.W.2d at 389.

The Tennessee Supreme Court has held that in order for a defendant to establish that a Brady violation has occurred, four elements must be shown. Those elements are as follows:

> 1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2) that the State suppressed the information;
> 3) that the information was favorable to the accused; and
> 4) that the information was material.

Johnson, 38 S.W.3d at 56. The defendant bears the burden of proving a Brady violation by a preponderance of the evidence. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). In the case under submission, it is clear that the Defendant has proven the first element. The record establishes that, on January 21, 2003, prior to the Defendant's trial, he made a general Brady request. Therefore, we turn to decide whether the State suppressed the information.

After thoroughly reviewing the record, we conclude that the Defendant has also proven the second element, that the State suppressed this information. While the Defendant was afforded "open file" discovery, the State did not provide the statement at issue in response to the Defendant's specific Brady request, which it has a duty to do. Therefore, we conclude that the Defendant has satisfied the second element. We now decide whether the information was favorable.

Information that is favorable to the defendant exonerates the defendant, corroborates the defendant's position in asserting his innocence, or would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than the defendant killed the victim. Johnson, 38 S.W.3d at 55-56. The Tennessee Supreme court has articulated the standard for favorable evidence as, "Evidence is favorable to an accused where it exculpates the accused, mitigates the punishment, or impeaches the prosecution's witnesses." Smaple v. State, 82 S.W.3d 267, 270 (Tenn. 2002). In other words, information is favorable if it

14

"provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Johnson, 38 S.W.3d at 56-57.

In the case under submission, Chanita Flowers did not testify at trial. Accordingly, this information has no impeachment value, but may still be favorable if it significantly aids the defendant's case by corroborating the defendant's story or calling into question a material element of the prosecution's version of the events. Chanita Flowers, who was nine years old at the time, gave a statement to police in which she told them that she saw two men at the door the night of the shooting and stated, "they had on black mask." She then identified the picture of someone other than the Defendant as one of the men, presumably with a mask, that she saw shooting at her house that night. The Defendant's "story" or theory of the case was that his statement to police that he was with his brother when his brother shot the victim was not true, and that all the eyewitnesses were mistaken when they identified him. Presenting no witnesses, he relied upon holding the State to its burden of proof. The State's theory was that there were multiple shooters, one of whom was the Defendant. Chanita Flowers' identification of another shooter is not inconsistent with the State's theory, nor does it exonerate the Defendant. However, it does furnish some slight "corroboration to the defendant's story" that someone other than the Defendant shot the victim. As such, the information may satisfy the requirement of being favorable to the Defendant. Accordingly, we proceed to determine whether this evidence is "material" such that its suppression violated due process.

Evidence is "material" when there is a "reasonable probability" that the result of the proceeding would have been different had the exculpatory evidence been disclosed. Johnson, 38 S.W.3d at 58; see United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to "undermine . . . confidence in the outcome" of the trial. Bagley, 473 U.S. at 682.[2] Materiality does not demand a showing by a preponderance that the suppressed evidence would have resulted in the defendant's acquittal. Kyles v. Whitley, 514 U.S. 419, 434 (1995). Materiality is also not a sufficiency test. Johnson, 38 S.W.3d at 58. Furthermore, once a constitutional error has been found, there is no need for further harmless-error review. Kyles, 514 U.S. at 435. Suppressed evidence is to be considered collectively, not item by item to gauge the materiality. Id. at 436. As stated by the United States Supreme Court, establishing materiality requires "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

In the case under submission we cannot conclude that Chanita Flowers' testimony, if presented to the jury, would have put the whole case in such a different light as to undermine confidence in the jury's verdict. The State did not call Chanita Flowers to testify, and we are not convinced that her testimony would have in any way impacted the State's case. There were five witnesses who testified for the State that they saw the Defendant in the area of the shooting or

---

2 In formulating this materiality standard, the Bagley Court explained that it was adopting the definition of "reasonable probability" that it articulated in Strickland v. Washington in the context of ineffective assistance of counsel claims. Bagley, 473 U.S. at 682.

commit the shooting. Randall White said that he saw four men, one of whom was the Defendant, and he saw the Defendant start shooting toward the open door with some kind of rifle. He also said that he saw the Defendant continue to shoot as he took "one step into the kitchen." Ashanti Pinkins testified that the Defendant stopped her and three of her friends and asked if they had seen Randall White, also known as "Red." After a brief conversation, the Defendant held a gun to the waist of one of her friends, Timothy Jackson, and Jackson ran away. Pinkins identified the Defendant in a photo array shortly after the shooting, and then, after having her memory refreshed with this photo array, she identified the Defendant in court. Jackson testified that the Defendant, after asking if Jackson had seen "Red," put a "long" gun to his side. Jackson identified the Defendant in a photo array. George Norman testified that he saw the Defendant walking towards the victim's home with three or four other men. Cornelius Jefferson testified that the Defendant told him that they were going to Raintree Apartments to "stop threats." He said that the Defendant had a rifle and that the Defendant forced him to knock on "Red's" door. Jefferson said that the Defendant then pushed him aside, and he ran away.

Further, the Defendant discussed the shooting with police and indicated that he participated in the crime. He told police that his brother was mad at "Red" for making threats and that his brother went to "Red's" house and shot Mackey. He said that he "just went to watch." When asked if he was sorry for killing someone the Defendant responded, "I ain't sorry, he shouldn't been going to my mama's house with his hands in his pockets like he had a gun." The Defendant told police that he could not tell them where the rifle was because it would put his family in danger.

In light of the strength of the State's case, the young age of the witness making the statements, and the fact that the statements do not exonerate the Defendant but simply implicate another, additional shooter, we conclude that confidence in the jury's verdict is not undermined. The failure to establish the "materiality" of the favorable evidence thus defeats the Defendant's due process claim premised on the prosecution's suppression of exculpatory evidence. This issue is without merit.

## B. Evidence of Previous Robbery

The Defendant next contends that the trial court erred when it allowed the State, in its opening statement, to say that the evidence would show that Randall ("Red") White was able to identify the Defendant because the Defendant had previously "robbed him a couple of weeks earlier." Additionally, the Defendant argues that it was reversible error for the trial court to allow White and Christina Flowers to testify that they knew the Defendant and could identify him because the Defendant had "robbed" White several weeks prior to the shooting for which the Defendant was on trial. The Defendant asserts that the trial court's admittance of this evidence violates Tennessee Rule of Evidence 404(b). Conversely, the State asserts that, after a jury-out proceeding, the trial court determined that the evidence was admissible for purposes of establishing identity only, and it would instruct the jury accordingly. The State contends that this finding of the trial court satisfied Tennessee Rule of Evidence 404(b), and thus the information was properly allowed.

16

Tennessee Rule of Evidence 404(b) states that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The sentencing commission comments to this rule state:

> The Commission drafted Part (b) in accord with the Supreme Court's pronouncements in State v. Parton, 694 S.W.2d 299 (Tenn. 1985). There the Court established precise procedures to emphasize that evidence of other crimes should usually be excluded. In the exceptional case where another crime is arguably relevant to an issue other than the accused's character – issues such as identity (including motive and common scheme or plan), intent or rebuttal of accident or mistake–the trial judge must first excuse the jury. Then the judge must decide what material issue other than character forms a proper basis for relevancy. If the objecting party requests, the trial judge must state on the record the issue, the ruling, and the reason for ruling the evidence admissible. Finally, the judge must always weigh in the balance probative value and unfair prejudice. If the danger of unfair prejudice outweighs the probative value, the court should exclude the evidence even though it bears on a material issue aside from character. Finally, according to Parton, the trial judge must find that the evidence is "clear and convincing" that the defendant committed the other crime.

If the trial court substantially complies with the strict procedural requirements of this rule of evidence, we review its decision on the admissibility of evidence for an abuse of discretion. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997). However, the decision of the trial court is afforded no deference, and our review is de novo, if the procedural requirements are not substantially followed. Id.

Generally, Rule 404(b) is one of exclusion, and evidence that an accused has committed some other crime or bad act independent of that for which he is charged is not admissible, even

17

though it may be a crime or act of the same character as that for which the accused is on trial. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). If, however, evidence that a defendant has committed a crime separate from the one for which he is being tried is relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. Id. "Only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, motive, opportunity, or rebuttal of mistake or accident." State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995). The Tennessee Supreme Court has confirmed that evidence of crimes other than that for which the defendant was on trial was properly admitted as being relevant to the issue of identity of the defendant. Howell, 868 S.W.2d at 254; State v. Taylor, 669 S.W.2d 694, 697-98 (Tenn. 1983).

In the case under submission, the trial court clearly met the first two procedural requirements of the 404(b) test. The record establishes that, when the Defendant objected to the State's opening statement, and the trial court excused the jury. The Defendant's counsel then stated:

> Your Honor, we would object at this time to any reference to the robbery that allegedly occurred between [the Defendant] and [White]. We believe that such mention of this is extremely and unduly prejudicial. . . . [T]here's no proof that this robbery ever happened. [The Defendant] was not arrested for that robbery. He wasn't charged with it. It was never even reported.

The court stated:

> As I understand [it], [the State] mentioned the robbery as a matter of identification . . . a victim of the robbery knew the defendant because he had been robbed by him. This Court will tell the jury at the proper time that the [D]efendant is not on trial for that robbery. But I am going to overrule the objection, if I understand [the State's] opening statement and what you hope to establish though mentioning the robbery. And not because of the robbery itself but only because of the identification matter. So I am going to overrule that objection and note your exception . . . .

While the Defendant's counsel did not request that the trial court state in the record its reasons for admitting this evidence, the court stated its reason in the record, finding that the testimony about the alleged robbery was relevant to the issue of identity. The Defendant did not renew his objection during White's testimony about the alleged robbery, but the Defendant did object to Christina Flowers' testimony about the robbery. After a hearing outside the presence of the jury, the trial court said:

> The defense cites Rule 404(b). Evidence of other crimes, wrongs or acts are not admissible to prove the character of a person in order to show actual conformity with a character trait. I'm assuming that the defense relies upon the fact that when this witness testified that she saw the defendant committing the robbery,

18

that really what the State is trying to do is to get the evidence of the defendant's character trait, a robber, into the proof, that he committed another robbery. And that the question to this witness is based solely upon that an answer that would distract from the issue in this case. Did the defendant commit the offenses that are alleged in this indictment? That's what the issue is. Did this defendant commit the offenses alleged in the indictment? Therefore, the trier of fact has to listen and make an objective determination of the facts. And this fundamental question is, is the probative value of her answer prejudicial to this defendant? Well, the questions are being asked primarily to establish identification and not to establish a bad character trait.

Question: Did you see this man shooting? Yes. How do you know this man? I know this man because he – I saw him at one other time and he was robbing somebody. Well, it may be prejudicial but the probative value far outweighs the prejudice because that's where she saw him, committing a robbery. And the answer does not necessarily indicate that this man has a propensity for robbery.

The 404(b) allows evidence under certain conditions. And I would suggest that identification is at issue here because this young lady says at first she didn't identify anybody, then upon . . . redirect and refreshing her memory, she does. So identification is at issue. And to ask, how do you know this man? I know this man from seeing him commit a robbery. Well, I'm going to allow that.

I will charge this jury that the defendant is not on trial for a robbery that occurred at another time or any other offense, for that matter. He's only on trial for the offenses alleged in the indictment and the jury is not to consider evidence of another crime in anyway whatsoever. So I am going to charge the jury and make sure they understand that.

But I think that this evidence from this young lady is relevant to establish identification. She has to establish how she knows this man and she knows him from seeing him commit a robbery. It's extremely probative in this case. So I am going to allow it.

Now what I've allowed you to do is to have a hearing outside the jury's presence so that the record can be protected. And once we've had the hearing I have to determine whether or not the answers are in conformity with the character trait. There's not – there hasn't been any proof that this gentleman is a robber. I don't remember the question, the state asking any question of any witnesses is he robbing people out in the community. So we are not trying to establish a pattern of robbery with this defendant, only that she saw him do something and she remembers him from that occasion. So under those circumstances I'm going to allow it. You can note your exception.

19

We conclude that the trial court substantially complied with the last two procedural requirements required by 404(b).  The trial court clearly stated that the probative value of the testimony regarding the alleged robbery outweighed any prejudicial effect that this testimony would have.  Finally, the trial court did not state in the record that it found that the robbery occurred by clear and convincing evidence, but this conclusion is implicit in its findings and inescapable considering the Defendant's own statements regarding the robbery in addition to the testimony of both White and Flowers.  Accordingly, we review its determination for an abuse of discretion.  We conclude that the trial court did not abuse its discretion by allowing the testimony about the robbery.

In any event, even if the trial court had abused its discretion by admitting the 404(b) evidence pertaining to the robbery, we conclude that the error was harmless.  The Defendant, in his statement to police, told them that his "cousins" had robbed White and that White thought that the Defendant and his brother committed this robbery.  This statement was clearly admissible as a party admission.  White then testified about the robbery and testified that he was able to identify the Defendant because he had seen him before, during the robbery.  Christina Flowers similarly testified.  Given this testimony, in combination with the strength of the other evidence against the Defendant, we do not believe that the jury's hearing about the Defendant's other bad act more probably than not affected the result of the trial.  See Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(a).  Therefore, any error was harmless.

## C. Expert Fingerprint Testimony

The Defendant contends that the trial court erred when it allowed the State to present expert fingerprint evidence that the Defendant was the same man as the person that the witnesses identified from the photo array that was shown to them close to the date of the murder.  The Defendant first asserts that he was not given adequate notice of this expert testimony and next asserts that this testimony was irrelevant.  The State counters that the Defendant had lost weight and had otherwise changed his appearance from the time of the murder to the day of his trial, making some of the State's witnesses, who had identified the Defendant's picture after the murder, unable to identify the Defendant in the courtroom.  Therefore, the State asked for, and was given, permission to introduce expert testimony that the Defendant's fingerprints, taken the morning of trial, matched the fingerprints of the man who was pictured in the photo array.

We first note that, as with most other evidentiary questions, the admissibility of expert opinion testimony is a matter which largely rests within the sound discretion of the trial court. State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).  The abuse of discretion standard contemplates that, before reversal, the record must show that a judge "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining."  State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999); State v. Shuck, 953 S.W.2d 662, 669 (Tenn.1997).

With regard to the Defendant's first contention, Tennessee Rule of Evidence 702 provides that:

20

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

The Defendant is not contesting the expert witness' qualifications, but rather insists that he was surprised by the testimony in this respect because he was not provided adequate notice. We conclude that the Defendant cannot prevail on this issue because, although the Defendant argues that he had no notice that the expert would testify about the fingerprint comparison at trial, he fails to explain how he was prejudiced by this lack of notice. See State v. Reid, 91 S.W.3d 247, 293-94 (Tenn. 2002). The Defendant does not offer in his brief or in his motion for new trial any way that the testimony could have been refuted by any expert witness he may have secured. The testimony was simple and concise, and merely identified the Defendant's fingerprints as matching the fingerprints of the man identified by the witnesses in the photo array. On cross-examination, the Defendant amply brought out that there were no fingerprints found at the murder scene that would link the Defendant to this crime. Therefore, in light of the absence of any prejudice, we conclude that the Defendant cannot sustain his objection based upon the alleged lack of adequate notice.

The Defendant next contends that this testimony was irrelevant and prejudicial. We cannot agree. Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The expert fingerprint testimony is clearly relevant in that the identity of the Defendant was at issue in the case. The witnesses who identified the Defendant shortly after the murder could no longer recognize him and could not point him out at trial. The State noted the difference in the Defendant's appearance, and the State's expert testified that the Defendant's fingerprints matched those of the man in the photo array. The trial court did not abuse its discretion when it determined that this evidence was relevant to prove the Defendant's identity and to explain the witnesses' identification of the Defendant in the photo array.

Finally, the Defendant contends that the trial court abused its discretion when it found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The Defendant contends that the fingerprint evidence "served only to confuse the jury into thinking there was actual fingerprint evidence." We do not agree. Fingerprinting a defendant is non-testimonial evidence. State v. Detrick Cole, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969, at *9 (Tenn. Crim. App., at Jackson, Nov. 24, 2003), *automatic right of appeal to the Tennessee Supreme Court pending* (citing Schmerber v. California, 384 U.S. 757, 764 (1966)). It is well-settled that:

[A]n accused may be required to stand so that he may be observed; to walk; to remove a veil, visor, mask or glasses; to put on a wig and sunglasses; to exhibit his hands; to roll up his sleeve to show a tattoo; to submit to the taking of his fingerprints; to remove his coat and shirt to show scars; to allow inspection of his

21

face for identifying marks; to move his feet into view; or to put on a garment, hat or cap.

3 Wharton's Criminal Evidence § 585, at 426-29 (14th ed. 1987); <u>State v. Rodriguez</u>, 752 S.W.2d 108, 112 (Tenn. Crim. App. 1988). In the case under submission, the trial court did not abuse its discretion by finding that the probative value of the non-testimonial evidence substantially outweighed any prejudice. The State was not trying to use this testimony as a "back door" to admit prior bad act evidence as the Defendant contends, rather it was using this evidence to show that the Defendant had changed his appearance. This is a proper use of this evidence when identity is at issue. This issue is without merit.

### D. Biblical References

The Defendant next contends that the trial court failed to grant a mistrial when the State made biblical references during its closing argument. Specifically, the Defendant asserts that the prosecution characterized the Defendant as the "devil." The Defendant's counsel, during his closing argument, attacked Cornelius Jefferson's credibility stating that his testimony was "bought and paid for" by the State because the State "told him if you come in and testify, we will give you eight years, and, know what, you can apply for probation." The Defendant's counsel also said, "If you go to a restaurant and they bring out your food and it's got a bug in it, you'd throw it away. The State, on the other hand, wants you to ignore the bug, Cornelius Jefferson, and eat the food anyway. They want you to believe his testimony even though it's admitted that it's been bought and paid for." In response, the State argued:

> Remember early on I think it's almost impossible for you not to have some doubt at the end of this trial. You're not going to know, we're not going to know, we don't have a machine, we don't have a video, it's just this world is just not made that way, you're going to–you have heard people come in and tell you what they saw. And they saw, most of them who saw anything, saw [the Defendant] at the scene before and after and shooting a gun or with a gun.
>
> You can't, if you're after the devil, I'm just saying, if you're after the devil you can't go to heaven and get angels to testify. You have to go into hell and get his friends, his other, the other devils to testify.
>
> [Defense Counsel]: Objection, you Honor. May we approach?
>
> (Bench conference) [Defense Counsel]: That was an improper characterization. Certainly had a description tendencies to it. The Court: Excuse me. The objection is overruled. (Bench conference concluded).
>
> [State]: As I was saying, you can't go to heaven to get an angel to testify when you're after the devil. You got to go into hell and get one of the devils.

I'm not here to tell you that Cornelius Jefferson is a devil, but he certainly is not coming to you with unclean hands. And there is a question about that. Sometimes we have to use people like Cornelius Jefferson in order to get what we submit to you is the person who is primarily responsible for this crime and that's [the Defendant]. . . .You take Cornelius Jefferson's statement for what it's worth. . . .

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)); State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Terry, 46 S.W.3d at 156 (citing Sutton, 562 S.W.2d at 823); see Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975); Goltz, 111 S.W.3d at 5. This Court has explained that "[closing] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." Goltz, 111 S.W.3d at 5 (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

When an appellate court finds an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." Goltz, 111 S.W.3d at 5 (citing Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." Goltz, 111 S.W.3d at 5-6 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

In Goltz, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); TENN.CODE OF PROF'L RESPONSIBILITY DR 7-106(c)(4).
3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).
4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the

23

guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6 (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

Initially, we note that references to biblical passages or religious law during the course of a criminal trial are inappropriate. State v. Middlebrooks, 995 S.W.2d 550, 559 (Tenn. 1999); State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998). This type of argument has been admonished by both this Court and our Supreme Court, yet the arguments continue to be made reflecting a "blatant disregard for our decisions of a level of astonishing ignorance of the state of the law in this regard." Middlebrooks, 995 S.W.2d at 559. As stated in Middlebrooks, "The obvious danger in such references by both prosecutors and defense counsel is the risk that a [verdict] may be made not upon the facts and the law but on an appeal to the bias or passion of the jury." Id.

Considering that the circumstantial evidence of the Defendant's guilt in this case was strong and that the religious reference was relatively minor and was stated with regard to both the Defendant and the State's own witness, we conclude that the comment did not affect the verdict. This conclusion accords with other decisions of this State. See e.g., Middlebrooks, 995 S.W.2d at 559-60 (holding that prosecutor's statement that "The same book that says vengeance is mine says whoever sheddeth man's blood . . . then by man shall his blood be shed. The Lord meant for the system of laws and justice to govern societies wherever they are, and you are the tool of the Lord, that part of justice" was improper, but harmless); Cribbs, 967 S.W.2d at 783-84 (holding that it was improper for prosecutor to state, "whatever a man sows, so shall he reap" in his argument, but that such error was harmless); State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998) (holding that the prosecutor's repeated references to the defendant as "the evil one," though improper, did not affect the verdict to prejudice the defendant"); State v. Kena Hodges, No. 01C01-9804-CR-00170, 1999 WL 618861, at *15 (Tenn. Crim. App., at Nashville, Aug. 11 1999), *perm. app. denied* (Tenn. Jan. 31, 2000) (holding that prosecutor's reference to the Ten Commandments did not affect the verdict). Cf. State v. McCary, 119 S.W.3d 226, 254-55 (Tenn. Crim. App. 2002) (holding that prosecutor's statements that the defendant may well be "damned by God for the rest of eternity" in combination with other improper statements were so inflammatory that a new trial was warranted).

### E. Sleeping Juror

The Defendant contends that the trial court erred by failing to declare a mistrial after the Defendant pointed out that one of the jurors had appeared to be asleep. The trial court permitted the attorneys to question the juror outside the presence of the other jury members. The juror explained that she had not been asleep but had only closed her eyes because of sinus problems and had heard the testimony of the previous witness. The trial court denied the Defendant's

24

motion. The mere fact that a juror becomes drowsy for a short time is not of itself a ground for a new trial; the defendant must show prejudice. State v. Chestnut, 643 S.W.2d 343, 346 (Tenn. Crim. App.1982); State v. Donald Wayne Marshall, No. E1999-00922-CCA-R3-CD, 2000 WL 193514, at *5 (Tenn. Crim. App., at Jackson, Feb. 18, 1999), *no perm. app. filed*. In light of the juror's testimony that she had been awake and had not missed any evidence, we conclude that the Defendant has failed to make this showing. This issue is without merit.

## F. Testimony of Sergeant Berryman

The Defendant next contends that the trial court erred when it allowed Sergeant Berryman to testify that Ashanti Pinkins identified the Defendant from a photo array and said "this is the person I seen . . . at Red's door shooting," because this statement was inadmissible hearsay. The State counters that this evidence was admitted as a prior inconsistent statement.

The admission of evidence is largely discretionary, and the trial court's discretion will not be disturbed on appeal unless there has been clear abuse. State v. Robertson, 130 S.W.2d 842, 856 (Tenn. Crim. App. 2003) (citing State v. Harris, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999)). The admissibility of the prior statement of a witness is governed by Tennessee Rule of Evidence 613, which provides, in part, "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). When a hearsay statement is being offered as a prior inconsistent statement, its admissibility is limited to its impeaching effect on the witness' credibility; it should not be relied upon as substantive evidence of the accused's guilt or innocence. See generally State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). Thus, upon request, the trial court must instruct the jury that the prior inconsistent statement should be considered only as it reflects upon the witness' credibility. Id.; see also Tenn. R. Evid. 105 (stating "When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to is proper scope and instruct the jury accordingly"). Where no request is made, the evidence may be considered "as if it were, in fact, fully admissible under the law of evidence." Smith, 24 S.W.3d at 280.

In the case under submission, the requirements for admissibility of the prior statement were met, but because the prior statement was hearsay, its admissibility is limited to its impeaching effect on the witness' credibility. The Defendant's counsel objected to the admissibility of the prior inconsistent statement, but, upon the court allowing the evidence, did not request a limiting instruction. Accordingly, the Defendant will not now be heard to complain. See Tenn. R. App. P. 36(a) (stating "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, this issue is without merit.

## G. Sufficiency of the Evidence

The Defendant in the case under submission was convicted of: the first degree felony murder of Marcel Mackey; the second degree murder of Mackey; the attempted first degree murder of Randall ("Red") White; and the reckless endangerment of Anitra Flowers. On appeal, the Defendant contends that the evidence presented at trial was insufficient for a rational trier of fact to find him guilty beyond a reasonable doubt. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

### 1. Attempted First Degree Murder

We first discuss whether the evidence is sufficient to sustain the Defendant's conviction for the attempted first degree murder of Randall ("Red") White. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." Tenn. Code Ann. § 39-12-101(a)(2) (2003). First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2003). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to

26

> determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

We conclude that, in the light most favorable to the State, the evidence is sufficient to sustain the Defendant's conviction for attempted first degree murder. The evidence established that the Defendant, or his cousins, robbed White and White thought that the Defendant and his brother were responsible for the robbery. White went to the Defendant's mother's house with his hands in his pockets as if he had a gun, which bothered the Defendant. On the day of the attempted murder the Defendant brought some guns home and told his brother and Jefferson that they needed to go solve a problem at the other end of the neighborhood. On the way, the four men ran into a group of three teenagers and asked the teenagers "where Red at?," and the teenagers responded that they did not know. After one of the teenagers mentioned the Defendant by name, the Defendant held a gun to Jackson's side until he ran away. The Defendant, his brother, Jefferson, and one or two other men were seen proceeding to White's house and all were armed. The Defendant told Jefferson to knock on White's door and, when the door was opened, he pushed Jefferson out of the way. The Defendant fired an assault rifle into the house. White was shot multiple times with multiple weapons, one of which was a rifle. We hold that sufficient evidence existed for the jury to find that the Defendant acted with premeditation when he attempted to kill the victim and the evidence is, therefore, sufficient to sustain his conviction for attempted first degree murder.

### 2. First Degree Felony Murder

Now, we turn to decide whether the evidence is sufficient to sustain the Defendant's conviction for the first degree felony murder conviction and the second degree murder conviction, both of which were committed against Marcel Mackey. As a preliminary matter we note that the trial court properly merged the second degree murder conviction into the Defendant's conviction for first degree felony murder, and the Defendant was sentenced only on the first degree felony murder conviction. However, so as not to pretermit any issues, we discuss the sufficiency of the evidence with regard to both convictions.

27

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder . . . ." Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions." Tenn. Code Ann. § 39-13-202(b). In accordance with our previous holding, that the evidence is sufficient to sustain the Defendant's conviction for the attempted first degree murder of Randall White, we conclude that it is also sufficient to support the Defendant's conviction for the first degree felony murder of Mackey. The evidence establishes that the Defendant went to White's home armed with an assault rifle to kill White. After Jefferson knocked on White's door, Mackey opened the door, and the Defendant began firing his rifle. Mackey suffered multiple gunshot wounds, many of which would have been fatal. Some of these wounds were from an assault rifle. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for felony first degree murder.

### 3. Second Degree Murder

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. §§ 39-13-201, - 210(a)(1) (1997 & Supp. 2002). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b) (1997 & Supp. 2002). "'A person can act knowingly irrespective of his or her desire that the conduct or result will occur.'" State v. Kelley, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000) (quoting State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); State v. Rutherford, 879 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). A homicide, once established, is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992).

We believe the evidence is sufficient to warrant the jury's conclusion that the Defendant acted "knowingly." Viewed in the light most favorable to the State, the evidence shows that the Defendant went to Randall White's home armed with an assault rifle intending to kill White. After White's door was opened, the Defendant fired his gun into the home. Mackey suffered multiple gunshot wounds. Accordingly, we find that the evidence is sufficient to sustain the jury's finding that the Defendant acted knowingly when he killed Mackey.

### 4. Reckless Endangerment

Finally, we turn to decide whether the evidence is sufficient to sustain the Defendant's conviction of the reckless endangerment of Anitra Flowers. A person commits reckless endangerment when he or she "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a) (1997). A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(a)(31). The risk "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the

circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-13-103(a)(31).

Viewed in the light most favorable to the prosecution, the evidence shows that the Defendant, along with three or four other men, fired an assault rifle into the apartment home of Randall White. Present in the home were four adults, two women and two men, and two children. In addition to killing Mackey and injuring White, the Defendant also wounded Anitra Flowers. The evidence was sufficient for the jury to conclude beyond a reasonable doubt that the Defendant was guilty of recklessly endangering Flowers. This issue is without merit.

### III. Conclusion

In accordance with the foregoing, we conclude that there is no reversible error in the judgments of the trial court and that sufficient evidence exists to sustain the Defendant's convictions. Therefore, the judgments of the trial court are AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE